## JAMES R. SMITH *vs.* UNITED STATES.

The acts of Congress of 1825, and those of 1835-46-56 relative to the punishment of crimes against the United States, were not designed to be restrictive of the act of 1790, but rather to enlarge the jurisdiction of the United States Courts.

Marine torts, committed upon tide waters, within the boundaries of a county, are within the jurisdiction of the United States.

In a qualified sense, Territorial courts are United States courts. They exercise the combined jurisdiction of Circuit and District Courts of the United States.

Puget Sound, with its multitude of inlets and bays, is an arm of the sea.

A Territory is not a *State,* nor is the word *State* used as synonomous with *Territory* in the act of 1825.

The Court, while holding that the United States has jurisdiction of the offense charged, also intimates a concurrent jurisdiction in the Territorial Courts.

It is competent for the prosecuting officer of the United States to enter a *nolle,* any time before verdict. Errors committed under an indictment discharged, cannot be taken advantage of under a subsequent indictment, unless proper objection be made under the latter indictment.

Evidence of the dangerous character of deceased not admissible when there is no evidence tending to show an assault, or threatened assault on his part.

Objections cannot be made in this Court to instructions given the jury, on the trial, unless excepted to at the time.

The district judge withheld from the jury instructions relative to manslaughter, telling the jury, however, that, if, having deliberated, they desired instructions on that subject, the Court would so instruct them. *Held,* Not to be error; and *held, further,* not error to refuse the requested instructions relative to manslaughter as none of the evidence tended to show manslaughter.

It is no less a crime to murder a foreigner than a citizen at a place within the admiralty jurisdiction of the United States Courts.

Granting or refusing a new trial is a matter within the discretion of the lower Court.

Error to the District Court for King County.

Opinion by DENNISON, Chief Justice.

The case came up on a writ of error to the District Court of the United States, in and for the Third Judicial District of Washington Territory, holding terms at Seattle for the counties of King, Kitsap and Snohomish. The history of the case is briefly this:

At the August term of said Court, A. D., 1868, John R. Smith was indicted by the Grand Jury, acting on behalf of the United States, for the murder of one Edward James Butler (mariner) on the 28th day of April, 1868. The said Edward James Butler, as was alleged, being then and there on board a certain bark called the *Marinus*, "riding at anchor below low-water mark on the high-seas, out of the jurisdiction of any particular State of the United States, and within the admiralty and maritime jurisdiction of the United States, etc." On being arraigned, and before pleading to the indictment, the defendant, John R. Smith, on the 19th day of August, filed an affidavit asking for a continuance of the case, and a change of venue to Pierce county. There is nothing of record showing that the Court ever acted on this application, but the journal entry states, that, "according to agreement of the defendant in person and by attorney with the attorney of the United States, made in open Court, this cause is ordered to the next term of the United States District Court at Port Townsend."

At the September term of Court at Port Townsend, the following order was made:

"Ordered by the Court that the case of the *United States vs. John R. Smith* take precedence in trial of the case of the *Territory of Washington vs. John R. Smith*." The defendant then interposed a plea to the jurisdiction of the Court, to which the U. S. Attorney filed a demurrer, admitting "that the crime charged was committed on board the bark *Marinus*, while riding at anchor in the bay of Port Blakely, below low-water mark, and that said vessel was being loaded with lumber." The plea to the jurisdiction is not sent up to this Court, and it does not

appear what the plea contained.. The Court sustained the demurrer, and held the plea to the jurisdiction insufficient, to which ruling of the Court the defendant excepted. On motion of the attorney for the United States, the Court then ordered the prisoner to be placed in the custody of the U. S. Marshal—that the case be remanded to King county for trial, "and that he there be placed in his original position in regard to his plea and defence." To this the defendant also excepted, and the case was sent back to the Court at Seattle, in King county.

At the ensuing term of Court at Seattle, the defendant, on the 17th day of February, 1869, filed a motion, "protesting against the jurisdiction" of that Court, on the ground that a change of venue was regularly taken from that Court to the U. S. District Court at Port Townsend, and asked the Court "to remand the case to Port Townsend for trial." Pending this motion, the Grand Jury on behalf of the United States, returned into Court a new indictment against the defendant for the same offense, (he having been previously brought into Court and exercised his right of challenge); whereupon the acting attorney for the United States entered a *nolle prosequi* on the old indictment. This was on 17th day of February, 1869. On the same day a copy of the new indictment was served on the defendant, and on the 19th he filed a motion to quash the indictment, alleging that the Court had no jurisdiction by reason of the former change of venue—that the offense was committed, if at all, within the boundaries of Kitsap county, and was an offense against the laws of the Territory, and not against the laws of the United States, etc. The motion to quash having been overruled and exceptions taken, the defendant on arraignment pleaded not guilty, and the case proceeded to trial, resulting in a verdict of guilty of murder, as charged in the indictment. The defendant thereupon filed a motion in arrest of judgment and for a new trial, which being overruled and exception taken, the Court on the 23d day of February, 1869, pronounced judgment and sentence of death, from which a writ of error is prosecuted to this Court. The errors assigned are as follows:

1. The Court below had no jurisdiction on the United

States side thereof; the act of Congress under which the indictment is drawn (Act 1790, Sec. 8) not applying to Port Blakely, the place of the alleged murder.

2. Said Court had no jurisdiction in the premises, the case having gone to another jurisdiction by change of venue.

3. The Court erred in excluding proper evidence from the jury, and in allowing improper evidence to go to. the jury.

4. The Court erred in giving improper instructions to the jury, and in refusing to give to the jury proper instructions asked for by the plaintiff in error.

5. The Court erred in overruling the plea to the jurisdiction and the motion for a new trial, and in arrest of judgment.

Before proceeding to consider these alleged errors, it may be well to notice some points made in argument by counsel for the prisoner.

In the first place, it was claimed that the indictment is drawn under Sec. 8, of the act of Congress of April 30, 1790. This is a mistake. Under whatever act of Congress the original indictment may have been drawn, it is very evident that the indictment on which the prisoner was tried and convicted was drawn under Sec. 4, of the act of March 3, 1825. The language used in the indictment in describing the locality of the offense charged precludes any other supposition. The locality is alleged to have been "on board the bark *Marinus*, then and there being afloat upon the bay of Port Blakely" * * * "within the admiralty and maritime jurisdiction of the United States," and "out of the jurisdiction of any particular State," etc. But it is said that the act of 1825 was intended to limit and restrict the act of 1790. It is a sufficient answer to this to say that the act of 1825 is entitled "an act more effectually to provide for the punishment of certain crimes against the United States, and for other purposes." We have no hesitation in saying that the act of 1825, as well as the subsequent acts of 1835-1846-1856, etc., relating to crimes and punishments, instead of being restrictive, were intended to enlarge the criminal jurisdiction of Courts of the United States.

34

In the case of the *United States vs. Roberts*, 2 N. Y. Leg. Obs., page 99, decided in 1843, the Circuit Court said, "under the act March 3, 1835, enlarging the criminal jurisdiction of Courts of the United States, those Courts have jurisdiction to try for offenses committed anywhere upon tide waters." See also, *United States vs. Lynch*, 2 N. Y. L., page 51. Another point relied upon by counsel for the prisoner was, that the place where the offense was committed is within the geographical boundaries of the county of Kitsap, which embrace, as is claimed, a large portion of the bay of Port Blakely, and that the Territorial Legislature has competent authority to embrace within the boundaries of counties all the waters of Puget Sound, Admiralty Inlet, and all south of the middle of Fuca Straits, thereby excluding the Courts of the United States from the exercise of jurisdiction over offenses or wrongs committed against persons or property on these waters. No authorities were cited in support of this position, and we fail to see any force in the argument, except that it proves too much. That marine torts and injuries committed on tide waters within the body of a county, are within the jurisdiction of the Courts of the United States, see 10 Wheaton, page 428; Olcott's R., page 329; 8 Law Rep., page 275; 2 Gall. R., page 400.

The position taken by counsel to the effect that the organic act of the Territory operates as a repeal of the "crimes" acts of 1790 and 1825, is too palpably untenable to require refutation by this Court. Another point made in the argument was, that the District Courts of the Territory are not Courts *of the United States*. Upon this point we find no difficulty in agreeing with the opinion expressed by the Supreme Court of Minnesota. In *Chouteau vs. Rice*, (1. Minn. R. page 192.) that Court said, "District Courts of a Territory are not District Courts of the United States according to the usual acceptation. Still, the Territorial courts, in a qualified sense may be designated as United States Courts. They are United States Courts, because they are created by authority of the United States."

We will now proceed to consider the alleged errors in the order in which they are assigned. And, first, as to the juris-

diction of the Court in which the prisoner was tried and convicted.

The Organic Act, creating the District Courts of the Territory, and conferring judicial powers upon them, declares that, "each of said District Courts shall have and exercise the same jurisdiction in all cases arising under the constitution and laws of the United States, as is vested in the Circuit and District Courts of the United States; and also of all cases arising under the laws of said Territory, and otherwise." These courts, then, exercise in the Territory the combined powers of the Circuit and District Courts of the United States. For the purposes of this case it is conceded that the United States have no unwritten criminal code to which resort can be had as a source of jurisdiction, and that the case must come within some statute of the United States, describing the offense and declaring the punishment. The statute under which the indictment is drawn is Sec. 4, of the act of Congress of March 3, 1825, Stat. at large, page 115, vol. 4, and reads as follows:

"That if any person or persons, upon the high seas, or in any arm of the sea, or in any river, haven, creek, basin or bay within the admiralty and maritime jurisdiction of the United States, and out of the jurisdiction of any particular State, shall commit the crime of willful murder,   *   *   * every person so offending shall be deemed guilty of felony, and shall, upon conviction thereof, suffer death."

To bring a case within this statute, the offense must be committed upon the high seas, or in an arm of the sea, or in a river, haven, creek, basin, or bay within the admiralty and maritime jurisdiction of the United States, and out of the jurisdiction of any particular State. Does the present case come within the language and meaning of this statute? The indictment alleges the offense to have been committed "on board the bark *Marinus* afloat on the bay of Port Blakely," a bay putting in from Puget Sound, which is in common-law acceptation an arm of the sea, as much so as is Long Island Sound. Speaking of "an arm of the sea," Story, J., says, "an arm of the sea may include various subordinate descriptions of waters

where the tide ebbs and flows. It may be a river, harbor, creek, basin or bay; and it is sometimes used to designate very extensive reaches of waters within the projecting capes or points of a country." *United States vs. Grush*, 5 Mason's R., page 290.

Puget Sound, then, with its multitude of inlets, havens, harbors and bays, may properly be held to be an arm of the sea. But, leaving this line of argument for the present, this court has no hesitation in holding that the bay of Port Blakely, where the bark *Marinus* was lying at the time the offense was committed, is within the admiralty and maritime jurisdiction of the United States. In the case of the *Lotty*, Olct. R., 329, the court said: "Admiralty has jurisdiction of collisions occurring on tide water, though the vessel be at a wharf in harbor."

So in 10 Wheaton, page 428, the court say, "a case of collision where the tide ebbs and flows, is within the admiralty jurisdiction of the United States, even though the locality be within the body of a county. See also, *United States vs. Wilson*, 3 Blatchf, 435; 5 How., 441; 12, 444; 20, 296; 22, 48.

In the *United States vs. Lynch*, (2 N. Y. Leg. Obs., page 51) the Court said, "under the act of March 3, 1835, prescribing a penalty for an endeavor to make a revolt on board ship, the jurisdiction of the circuit court extends to all places and waters where the tide ebbs and flows." Again, "in cases of torts, injuries and offenses, the locality brings them within the admiralty jurisdiction." Gilpin's R., page 524. See also, *United States vs. Coombs*, 12 Peters R., page 72; 1 West Law J., 444, (Circuit Court, Ga.) But, under Sec. 4, act of 1825, the locality of the offense must also be, "out of the jurisdiction of any particular State." Is the bay of Port Blakely out of the jurisdiction of any particular *State*? Of this, there would seem no room for doubt. A *Territory* is not a *State*. Nor are the words, "Territory" and "State," used as synonymous or convertible terms in the acts of Congress. For instance, in 1853, Congress passed "an act regulating fees and costs in *the several States*." By act of 1855, Congress extended the provision of the act of 1853 to the Territories, "as fully in all particulars as they would be, had the word *Territories* been in-

serted after the word *States,*" and the act had read "in the several *States* and *Territories* of the *United States.*"   See Brightly's Digest, page 273 and 279.   Again, in 1789, Congress passed an act adopting the pilot-laws "of *the States* respectively," and in 1866, an act declaring that no regulations shall be adopted by "*any State*" making discriminations in the rates of pilotage, etc.   Can it be claimed that the word "State" in these acts embraces Territories?   Besides, a Territory sustains no such relations to the government of the United States as does a State. The several States of the Union possess all the powers and attributes of independent nations, except such as they have delegated by the constitution to the United States.   Not so with a Territory.   But, even the decision in the Bevans' case proceeds upon the ground that Congress has the power, and may at any time by legislation give to the Federal courts jurisdiction over offenses committed in Boston harbor, but has abstained from doing so out of regard to the claims of sovereignty, long exercised, by the State of Massachusetts over these waters.   Again, in construing a statute, words are to have their ordinary meaning.   16 How., 257; 4 McLean, 473.   "Acts of Congress are to be construed by interpreting the words in their plain and actual meaning."   Ct. of Claims, Dev. R., page 157-8.   But the words of the statute, under consideration, have received a judicial construction.   "The words 'out of the jurisdiction of any particular *State*,' mean any particular State in the Union."   *U. S. vs. Furlong*, 5 Wheaton, page 134.   So, in the case of the *United States vs. Pirates*, 5 Wheat. 184-200, the court said: "The words 'out of the jurisdiction of any particular State,' in Sec. 8, of the crimes act of 1780, must be construed to mean out of any one of the United States."   So, also, "A 'State' must be a member of the Union.   It is not enough to be an organized political body within the limits of the Union."   5 How., page 343-377; 5 Pet., page 1-18; 2 Cranch, page 445.   Other authorities might be cited upon the general question of jurisdiction in this case, if it were deemed necessary.   For instance: "The provisions of the constitution which prescribe the limits of the judicial power, of the United States, restrict the jurisdiction of the States only, and do not apply to the Territories."

1 Pet., page 511.  And again, "Long Island Sound is not only in common-law acceptation an arm of the sea; it is a strait, and parcel of the high seas; and it is not within the territorial limits of any particular State."  See 4, Burr's R., page 2162; 20 Johns., page 98; Olcott's Adm. R., page 18.

Our opinion, then, is that the Court below had jurisdiction.  We do not, however, intend to say that the prisoner might not have been indicted and punished under the Statute of the Territory.  There may have been a *concurrent* jurisdiction.  Every citizen of the United States is also a citizen of a State or Territory.  He may be said to owe allegiance to two sovereigns, and may be liable to punishment for an infraction of the laws of either.  The same act may be an offense against the laws of both.  See 14 How., page 13; 1 Oregon R., 191; 5 How., 432; 9 How., 560.  But the question of *concurrent* jurisdiction is not before us, and we express no opinion upon it.

The second error assigned is want of jurisdiction by *reason of the change of venue.*  A sufficient answer to this is that the entry of *nolle prosequi* on the 18th day of Feb., 1869, after the new indictment was found, covered any errors or defects which may have existed in the previous proceedings.  That it is competent for the Prosecuting Attorney to enter a *nol. pros.* at any time before verdict, see *U. S. vs. Stowell*, 2 Curtis C. C. 153, and *U. S. vs. Peterson*, 1 Woodb. and M., 305.  Errors which have worked no injury to a defendant cannot be complained of in a court of review.

The third error assigned relates to the exclusion of proper evidence, and the admission of improper evidence.  The evidence excluded appears to have been offered for the purpose of showing that Butler, the deceased, was "*reported*" to be a "*violent, quarrelsome and dangerous man,*" and that "he had a slung-shot on board the bark *Marinus* at the time of the affray."  It nowhere appears in the evidence that Butler, at the time of the affray, was making an assault upon the prisoner, or attempting or threatening to make any.  On the contrary, it appears that Butler was leaning over the ship's rail with his back towards the prisoner at the time he was approached, and struck

on the back of the head with the capstan bar, by the prisoner. There is some evidence showing that, previously, opprobrious and insulting epithets had been applied to the prisoner by the deceased. Upon this state of facts, we cannot entertain a single doubt that the proposed evidence was properly excluded.

"On the trial of an indictment for homicide, evidence to prove that the deceased was well known and understood generally by the accused and others, to be a quarrelsome, riotous and savage man, is inadmissable. In the eye of the law, to murder the vilest and most abject of the human race is as great a crime, as to murder its greatest benefactor." Whart. Am. Crim. Law, page 265-296, (3d edition); 14 Maine Rep., 248; 9 Metcalfe R., 110; 3 Iredell R., 424. Again, "words of reproach, how grievous soever, are not provocation enough to free the party killing from the guilt of murder. Nor are contemptuous or insulting actions or gestures, without an assault upon the person. This rule governs every case where the party killing upon such provocation made use of a deadly weapon. *Com. vs. Webster*, 5 Cush., 295; *State vs. Barfield*, 8 Iredell R., 344; 8 Cal. R., 441.

The evidence objected to by the accused, and admitted by the Court, was in answer to this question put to the witness, Collins Steel:

"Did you hear any conversation at 4 o'clock on the 28th day of April, 1868, between Smith, the defendant, and a man on the wharf?"

This conversation had already been detailed by the witness, John Rosa, on cross examination by the prisoner's counsel, and was a conversation *between Smith and Butler*. See cross examination of John Rosa, and the answer given by Collins Steel. We think the evidence was properly admitted.

The fourth error assigned is, the giving of improper instructions to the jury, and the refusing to give others, asked for by plaintiff in error. The instructions given are contained in the charge of the Court, to which no exception was taken at the time, and consequently no objection thereto can be made at this time. 3 How., 553; 12 Pet., 102; 11 Pet. R., 185; 5 McLean,

218; 1 Parker's Crim. R., 424. Besides, the record contains the charge of the Court below at length, and there is nothing in the record to show wherein, or in what part, it is claimed to be objectionable. See 4 Pet., page 1; 1 Parker's Crim. R., page 272. The instructions asked for, and alleged to have been "refused," are seven in number. The bill of exceptions, signed by the Judge, states that, "the seven instructions were neither given nor refused, but withheld for reasons appearing in the evidence and charge of the Court." Counsel for the prisoner claims that, if not *given*, they were *refused*. This depends on the peculiar circumstances under which they were withheld. The indictment contains only one count, charging the statutory offense of *willful murder*. After stating to the jury the law concerning the crime of murder, the Judge said: "I have purposely abstained from saying anything to you at present in regard to the law of manslaughter. You will take the case as it now stands and retire to your room. After conferring together upon the case as now presented to you, if any of you should have any doubt as to the guilt or innocence of the defendant of the crime charged in the indictment, or if you should find any difficulty in agreeing upon a verdict, you will come into Court, and I will then state to you the law concerning the crime of manslaughter. And whether or not the defendant under the indictment can be found guilty of a crime less in degree than willful murder. For the present I withhold any further instructions."

The jury retired, and came back into Court in about one-half hour with a verdict of "guilty of murder as charged in the indictment." And what was the state of the evidence upon which the case was thus submitted to the jury? There was no evidence whatever, given or offered, even tending to prove any such provocation as would have mitigated the offense charged, or made it anything else, in law, than willful murder. 1 Par. Cr. R., 154. Nor was there any evidence tending to prove a "sudden quarrel," or that the prisoner had been "assaulted," or that he was "acting in self-defense," or "believed he was so acting."

The first, second and third instructions asked for, relating to the crime of manslaughter, were, therefore, abstract propositions based upon an assumed state of facts, not warranted by the evidence, and were properly withheld from the jury. "An instruction predicated on a state of facts which the evidence does not tend to establish, is abstract, and should be refused, although it may assert a correct legal proposition." 18 Ala. R., page 727; 20 How. R., page 152. "It is not error for the Court to refuse instructions to a jury upon a state of things of which there is no evidence in the case." 1 Oregon R., page 140. Again, "when one charged with homicide relies on an assault by the deceased, as extenuating his crime, he must show assault by satisfactory evidence; the jury must not conjecture, without evidence, that it may have been made." *U. S. vs. Armstrong*, 2 Curt. C. C., 446; *U. S. vs. McGlue*, 1 Curt. C. C.

The fourth instruction asked for was the usual one in regard to "a reasonable doubt," and is good law in a proper case. In this case, the record shows that the jury had no doubt of the guilt of the accused of the crime of murder, having returned their verdict in one-half hour after retiring; and we do not see how the giving of the fourth instruction asked for could have produced a different verdict. Besides, the Court, in its charges, had instructed the jury on this point quite as favorably as was asked by the fourth instruction, if not more so. It is well settled that a Court is not bound to repeat to the jury the same substantial proposition of law in different forms; it is sufficient if it be once laid down in an intelligible manner: 6 Pet. R., page 622. It is also true that a Court is not *in every case* to instruct a jury; that "if they have a reasonable doubt," etc., "they will give the defendant the benefit of such doubt." Nor would it be error, in every case, to refuse such an instruction. 18 Ala. R., page 727. The reason is, that the evidence in the particular case may be such as not to call for or warrant the giving of such instruction.

The fifth instruction asked for is not law. In substance, it requested the Court to say to the jury that, if the deceased was not an American citizen, and the bark not an American vessel,

35

etc., they must acquit.   Section 4, act of 1825, reads, "that if any *person* or *persons* on the high seas," etc., "shall commit the crime of willful murder," etc., "such person upon conviction shall suffer death."   Nothing is said in section 4 as to the citizenship of the slayer, or person slain, nor as to the character of the vessel on which the killing may have taken place.   The case of the *U. S. vs. Pirates*, (5 Wheat. 184) is sufficient authority on this point.   See also, 5 Wheat., 412; 1 Kent, page 393 and 394, (note) 8th ed.

The sixth instruction asked for is in effect the same as the fifth, and was properly withheld.   The charge of the Court below, that "it is of no consequence in this case whether the deceased was a citizen of the United States or a foreigner," was correctly given.

The seventh instruction, asking the Court to charge, "that, under the contract in evidence, the defendant had the right to the control of the vessel from the time of leaving San Francisco until she should have arrived at Port Townsend, after being loaded," etc., is not law, and was rightly withheld.

The fifth and last error assigned, is the overruling of the plea to the jurisdiction, and the motion for a new trial.   We have already disposed of the first question presented in this assignment of error.   As to the second, the refusal to grant a new trial, we hold the law to be this:   In the United States Courts, the granting or refusing a motion for a new trial on the application of the defendant in a criminal case, is a matter resting in the discretion of the Court,   *United States vs.* 1  *Wall. jr.,* 127; *United States vs. Keene,* 1 McLean, 429.   A refusal of the Court, therefore, to grant a new trial in such cases affords no ground for a writ of error.   The law is the same in civil cases. 4 Wheat., 213, 376; 7 Wheat., 248.

On the whole, we are unable to discover any error in the record to warrant a disaffirmance of the judgment.   It is therefore considered by this Court that the judgment and sentence of the Court below be and the same are hereby affirmed.   And the U. S. Marshal of the Territory is hereby authorized and

directed to carry said judgment and sentence into execution, according to the terms thereof, on the 28th day of April, A. D., 1870, at the hour of 2 o'clock, P. M., of said day.

KENNEDY, Justice, having acted as United States Attorney in the lower Court, did not sit in this case.