679 F.2d 1373
 73 A.L.R.Fed. 144, 1985 A.M.C. 1815
 UNITED STATES of America, Plaintiff-Appellee,
v.
Esteban MARINO-GARCIA and Omar Chaverra, Hernan
Ardila-Boyona, William G. Suarez, Valentin Torres-Camargo,
Ernesto Segundo Torres-Riasco, Evelio Pauth-Arzuza, Fabian
Perdoma-Cardona, Ramon Elias Reales-Morales, Defendants-Appellants.
UNITED STATES of America, Plaintiff-Appellant,
v.
Pablo Emilio CASSALINS-GUZMAN, Casimiro Diaz-Castillo,
Carlos Espana, Alfredo Pupo-Bolano, David Rene
Olaya-Betancur, Nemecia Hidalgo-Castillo, Jaime
Pimienta-Perez, and Luis Estanislao Perea-Ulloa, Defendants-Appellees.
 Nos. 81-5551, 82-5284.
 United States Court of Appeals,
Eleventh Circuit.
 July 9, 1982.
 
 G. David O'Leary, Miami, Fla. (Court-Appointed), for Marino-Garcia.
 Sophie Demayo, Coconut Grove, Fla., for Suarez.
 Dennis N. Urbano, Coral Gables, Fla., for Torres-Camargo.
 Steven H. Haguel, Miami, Fla., for Torres-Riasco.
 William M. Norris, Sonia Escobio O'Donnell, Asst. U. S. Attys., Miami, Fla., for the U. S.
 Kathleen A. Hamilton, Carres, Gamble & Hamilton, Coral Gables, Fla., for Pauth-Arzuza.
 John Lazarus, Miami, Fla. (Court-Appointed), for Perdoma-Cardona.
 Marc Cooper, Greene & Cooper, P. A., Miami, Fla., for amicus curiae (NACDL).
 Flynn, Rubio & Tarkoff, Vincent Flynn, Michael H. Tarkoff, Miami, Fla., for defendants-appellees.
 Appeals from the United States District Court for the Southern District of Florida.
 Before VANCE, JOHNSON and HENDERSON, Circuit Judges.
 JOHNSON, Circuit Judge:
 
 
 1
 We are faced today with an issue of first impression. We must determine whether 21 U.S.C.A. § 955a extends the criminal jurisdiction of the United States to all stateless vessels on the high seas engaged in the distribution of controlled substances.[1] We conclude that it does.
 
 I.
 
 2
 Two cases have been consolidated for the purposes of this appeal; the facts in each are substantially identical. In United States v. Marino-Garcia, No. 81-5551, the Coast Guard cutter DEPENDABLE[2] approached the vessel FOUR ROSES on the high seas 65 miles off the west coast of Cuba and 300 miles from Florida. Coast Guard officials boarded the vessel and discovered approximately 57,000 pounds of marijuana. No evidence reflected that the contraband was intended for the United States. Moreover, the FOUR ROSES was not an American ship but was instead a vessel without nationality.[3] Finally, the nine crewmen were all foreign nationals.
 
 
 3
 Coast Guard officials seized the vessel and arrested the crewmen. The crewmen were indicted for conspiracy to possess and possession of marijuana with an intent to distribute in violation of 21 U.S.C.A. § 955a. Defendants sought dismissal of the indictment. They argued that the court had no subject matter jurisdiction over stateless vessels absent proof of a nexus between the vessel and the United States. They further contended that the Government failed to allege sufficient facts necessary to establish the requisite nexus. The district court denied the motion.[4] After a jury trial, defendants were convicted on both counts and sentenced to varying terms of incarceration.[5] Defendants appeal.
 
 
 4
 In the companion case, United States v. Cassalins-Guzman, No. 82-5284, the Coast Guard cutter LIPAN encountered the vessel LADY MARK on the high seas in the vicinity of Cuba. The LIPAN forced the vessel to heave to and attempted to ascertain the LADY MARK's nationality. Crewmen on board informed personnel on the LIPAN that the vessel was registered in Colombia and that the next port of call was El Salvador. Coast Guard officials nonetheless boarded the LADY MARK to verify the nationality. The boarding party discovered approximately 20,000 pounds of marijuana on the vessel. The party also located four different national flags and $1,000 in United States currency. The boarding party did not, however, discover any evidence establishing that the crewmen of the LADY MARK intended to bring the illicit substance into the United States.
 
 
 5
 The LADY MARK defendants were all charged with conspiring to violate and violation of Section 955a. Defendants successfully moved to have the indictment dismissed. The district court assumed for purposes of the motion that the LADY MARK was a stateless vessel.[6] The district court concluded that the Government's failure to establish a nexus between the United States and the stateless vessel deprived the court of jurisdiction.[7] The Government appeals the dismissal.
 
 II.
 
 6
 (a)
 
 
 7
 We consider first defendants' contention that the United States may not assert jurisdiction over stateless vessels on the high seas[8] under Section 955a absent proof of a nexus between this country and the vessel. Section 955a prohibits any person on board a "vessel subject to the jurisdiction of the United States" from possessing a controlled substance with the intent to distribute.[9] The definition of "vessel subject to the jurisdiction of the United States" specifically includes vessels without nationality. 21 U.S.C.A. § 955b(d).[10] Thus, on its face, the statute does not require that there be a nexus between stateless vessels and the United States but instead extends this country's jurisdiction to all such vessels.
 
 
 8
 The legislative history of Section 955a indicates, however, that Congress intended to extend jurisdiction only to the "maximum ... permitted under international law." S.Rep. No. 855, 96th Cong., 2d Sess. 2 (1980), U.S.Code Cong. & Admin.News 1980, p. 2785. See also H.R. 323, 96th Cong., 1st Sess. 11 (1979) (Section 955a "is designed to prohibit all acts of illicit trafficking in controlled substances on the high seas which the United States can reach under international law.") (emphasis added); 125 Cong.Rec.H. 6380 (daily ed. July 23, 1979) (statement by Congressman McCloskey) (Section 955a "provides a sound basis for the prosecution of every person and vessel ... engaged in international traffic in drugs and to the broadest extent possible under international law.") (emphasis added). Jurisdiction under Section 955a may not therefore exceed the bounds of international law. Moreover, even had the intent of Congress been less than pellucid, the Supreme Court has long admonished that "an act of congress ought never to be construed to violate the law of nations, if any other possible construction remains...." Murray v. The Charming Betsy, 6 U.S. (2 Cranch) 64, 117-18, 2 L.Ed. 208 (1804); accord, Weinberger v. Rossi, --- U.S. ----, ----, 102 S.Ct. 1510, 1515, 71 L.Ed. 715, 721-22 (1982). As a result we must endeavor to interpret Section 955a in a manner consistent with international law. Accordingly, we must determine whether international law imposes any substantive restrictions upon this country's right to extend jurisdiction to all stateless vessels on the high seas.
 
 
 9
 (b)
 
 
 10
 Under international law, all nations have an equal and untrammelled right to navigate on the high seas. Convention on the High Seas Art. 2, opened for signature April 29, 1958, 13 U.S.T. 2312, T.I.A.S. No. 520 (entered into force September 30, 1962); The Marianna Flora, 24 U.S. (11 Wheat) 1, 43, 6 L.Ed. 405 (1826) ("Upon the ocean, then, in time of peace, all possess an entire equality. It is the common highway of all, appropriate to the use of all; and no one can vindicate to himself a superior or exclusive prerogative there."); Le Louis, (1817) 2 Dods 210, 243-44, Eng.Rep. 1464, 1475 (1923); see also G. Mangone, The Elements of International Law 163 (1967); H. Briggs, The Law of Nations 329 (rev.ed. 1952); H. Grotius, Mare Librum (1661). To insure the principle of freedom of the seas, international law generally prohibits any country from asserting jurisdiction over foreign vessels on the high seas.[11] The S.S. Lotus, (1927) P.C.I.J. ser. A, No. 10 at 25; see also G. Mangone, supra at 163; A. Higgens & C. Colombos, The International Law of the Sea § 270 at 206 (1945). Indeed, such vessels are normally considered within the exclusive jurisdiction of the country whose flag they fly. Convention on the High Seas, supra, Art. 6; United States v. Williams, 617 F.2d 1063, 1091 n.6 (5th Cir. 1980) (Roney, J. concurring); A. Higgens & C. Colombos, supra, § 255 at 194 (1945); see also United States v. Arra, 630 F.2d 836, 840 (1st Cir. 1980).[12]
 
 
 11
 This principle is, however, subject to recognized exceptions. Jurisdiction will lie where a nexus exists between a foreign vessel and the nation seeking to assert jurisdiction. See United States v. Petrulla, 457 F.Supp. 1367, 1371 (M.D.Fla.1978). Thus, under the objective principle, a vessel engaged in illegal activity intended to have an effect in a country is amenable to that country's jurisdiction.[13] Similarly, the protective principle allows nations to assert jurisdiction over foreign vessels on the high seas that threaten their security or governmental functions.[14] Jurisdiction may also be obtained under the passive personality principle over persons or vessels that injure the citizens of another country.[15] Finally, all nations have jurisdiction to board and seize vessels engaged in universally prohibited activities such as the slave trade or piracy.[16]
 
 
 12
 These restrictions on the right to assert jurisdiction over foreign vessels on the high seas and the concomitant exceptions have no applicability in connection with stateless vessels. Vessels without nationality are international pariahs. They have no internationally recognized right to navigate freely on the high seas. Convention on the High Seas, supra, Art. 6; United States v. Cortes, 588 F.2d 106, 109 (5th Cir. 1979); United States v. Monroy, 614 F.2d 61, 64 (5th Cir.), cert. denied, 449 U.S. 892, 101 S.Ct. 250, 66 L.Ed.2d 117 (1980); United States v. May-May, 470 F.Supp. 384, 398 (S.D.Tex.1979). Moreover, flagless vessels are frequently not subject to the laws of a flag-state. As such, they represent "floating sanctuaries from authority" and constitute a potential threat to the order and stability of navigation on the high seas. H. Meyers, The Nationality of Ships 318 (1967); M. McDougal & W. Burke, The Public Order of the Oceans 1084 (1962); see also United States v. Newball, 524 F.Supp. 715, 720 (E.D.N.Y.1981); United States v. Petrulla, supra, 457 F.Supp. at 1371; 9 M. Whiteman, Digest of International Law 21 (1968) ("The registration of ships and the need to fly the flag of the country where the ship is registered are considered essential for the maintenance of order on the open sea.").
 
 
 13
 The absence of any right to navigate freely on the high seas coupled with the potential threat to order on international waterways has led various courts to conclude that international law places no restrictions upon a nation's right to subject stateless vessels to its jurisdiction. For example, in Molvan v. Attorney-General for Palestine, A.C. 351 (1948), the British seized a stateless vessel on the high seas. The appellants contended that Great Britain violated the internationally recognized right of "freedom of the seas" by asserting jurisdiction over a stateless vessel on the high seas. The English Court rejected the argument.
 
 
 14
 (T)he freedom of the open sea, whatever those words may connote, is a freedom of ships which fly, and are entitled to fly, the flag of a State which is within the comity of nations. The (stateless vessel in this case) did not satisfy these elementary conditions. No question of comity nor of any breach of international law can arise if there is no State under whose flag the vessel sails .... (emphasis added).
 
 
 15
 Id. at 369. Thus the assertion of jurisdiction over stateless vessels on the high seas in no way transgresses recognized principles of international law. Accord, United States v. Dominguez, 604 F.2d 304, 308 (4th Cir. 1979), cert. denied, 444 U.S. 1014, 100 S.Ct. 664, 62 L.Ed.2d 644 (1980) (concluding that stateless vessels have "no rights under international law."); see also United States v. Rubies, 612 F.2d 397, 403 (9th Cir. 1979), cert. denied, 446 U.S. 940, 100 S.Ct. 2162, 64 L.Ed.2d 794 (1980); United States v. Cortes, supra, 588 F.2d at 110.
 
 
 16
 Furthermore, commentators discussing the issue have unanimously agreed that all nations have the right to assert jurisdiction over stateless vessels on the high seas. 9 M. Whiteman, Digest of International Law 21 (1968); I. Brownlie, Principles of Public International Law 212, 222 (1967); H. Meyers, supra, at 318-20 (1967); 1 L. Oppenheim, International Law 546 (7th ed. 1948); 2 G. Hackworth, Digest of International Law 725 (1942); R. Rienow, Test of the Nationality of a Merchant Vessel 12-15 (1937). See also M. McDougal & W. Burke, supra, at 1084-85.
 
 
 17
 We conclude, therefore, that international law permits any nation to subject stateless vessels on the high seas to its jurisdiction. Such jurisdiction neither violates the law of nations nor results in impermissible interference with another sovereign nation's affairs. We further conclude that there need not be proof of a nexus between the stateless vessel and the country seeking to effectuate jurisdiction. Jurisdiction exists solely as a consequence of the vessel's status as stateless. Such status makes the vessel subject to action by all nations proscribing certain activities aboard stateless vessels and subjects those persons aboard to prosecution for violating the proscriptions.
 
 
 18
 (c)
 
 
 19
 Having determined that international law in no way restricts the right of the United States to assert jurisdiction over stateless vessels on the high seas, we hold that Section 955a properly extends the criminal jurisdiction of this country to any stateless vessel in international waters engaged in the distribution of controlled substances.
 
 III.
 
 20
 Defendants next contend that Section 955a is unconstitutionally vague.[17] A statute will be deemed unconstitutionally vague if it fails to apprise a person of reasonable intelligence of the prohibited conduct. Grayned v. City of Rockford, 408 U.S. 104, 108, 92 S.Ct. 2294, 2298, 33 L.Ed.2d 222 (1972); United States v. Thompson, 603 F.2d 1200, 1203 (5th Cir. 1979); see also Village of Hoffman Estates v. Flipside, --- U.S. ----, 102 S.Ct. 1186, 71 L.Ed.2d 362 (1982). A statute, however, need only be written with a reasonable degree of certainty in order to withstand constitutional scrutiny. Boyce Motor Lines, Inc. v. United States, 342 U.S. 337, 340, 72 S.Ct. 329, 330, 96 L.Ed. 367 (1952); United States v. Barnett, 587 F.2d 252, 256 (5th Cir.), cert. denied, 441 U.S. 923, 99 S.Ct. 2031, 60 L.Ed. 396 (1978). Moreover, the fact that Congress could have worded a statute in a clearer fashion will not render it unconstitutional. United States v. Powell, 423 U.S. 87, 94, 96 S.Ct. 316, 320, 46 L.Ed.2d 228 (1973).
 
 
 21
 With these basic precepts in mind, we examine the challenged statute. Section 955a extends jurisdiction over "vessel(s) without nationality" and "vessel(s) assimilated to a vessel without nationality." Defendants complain that these phrases are laden with confusion and ambiguity and are beyond the comprehension of persons of ordinary intelligence.
 
 
 22
 Defendants apparently underestimate the cognitive faculties of persons of ordinary intelligence. The contested language cannot be viewed as either vague or ambiguous. The statute defines "vessel assimilated to a vessel without nationality" by referring to Article 6 of the Convention on the High Seas. Article 6 succinctly states that an assimilated vessel includes those ships "which sail under the flag of two or more States, using them according to convenience."[18] Section 955a therefore clearly includes those vessels that have evidenced a willingness to perform chameleon like changes of nationality as circumstances dictate. Further, "vessel without nationality", although undefined in the statute, obviously encompasses vessels not operating under the flag and authority of any sovereign nation. Thus, while Section 955a does not delineate the precise point at which a vessel becomes stateless or assimilated, it does provide clear and concise notice to all persons aboard vessels engaged in drug trafficking that the failure to unmistakably accede to the authority of a single sovereign while traversing the high seas will render them subject to the criminal jurisdiction of the United States. The Constitution does not require more.[19]
 
 IV.
 
 23
 Defendants challenge the trial judge's failure to suppress the marijuana found on board the FOUR ROSES. Defendants assert that their vessel was subjected to a "random" seizure by the Coast Guard.[20] They further contend that random seizures of vessels on the high seas violate the Fourth Amendment absent reasonable suspicion of illegal activity.[21] Defendants do not challenge the Coast Guard's legal authority to seize the FOUR ROSES. Further, they do not contest the search following the stop and seizure. Instead, defendants challenge only the constitutionality of the seizure under the Fourth Amendment.
 
 
 24
 In Delaware v. Prouse, 440 U.S. 648, 99 S.Ct. 1391, 59 L.Ed.2d 660 (1979), the Supreme Court held that random stops of automobiles violated the Fourth Amendment absent "articulable and reasonable suspicion" that the motorist was engaged in a violation of the law. The Ninth Circuit extended the rationale of Prouse to vessels on the high seas. In United States v. Piner, 608 F.2d 358 (9th Cir. 1979), a divided panel concluded that a random stop and safety inspection of an American vessel at night without reasonable suspicion of noncompliance with safety ordinances transgressed the Fourth Amendment. See also United States v. Streifel, 665 F.2d 414, 423 (2d Cir. 1981) (requiring reasonable suspicion to perform investigatory seizure of a Panamanian vessel on high seas after having obtained the permission of the Panamanian government to board).
 
 
 25
 In sharp contrast to the Ninth and Second circuits, the former Fifth Circuit refused to extend the reasoning of Prouse to vessels on the high seas.[22] In United States v. Williams, supra, 617 F.2d 1063 (5th Cir. 1980), the Court en banc rejected the applicability of "land-based" Fourth Amendment law to seizures on the high seas. Accord, United States v. Shelnut, 625 F.2d 59, 61 (5th Cir. 1980), cert. denied, 450 U.S. 983, 101 S.Ct. 1520, 67 L.Ed.2d 818 (1981) ("We have recently reaffirmed our long-standing position that seizures and searches on the high seas are fundamentally different from those on land."). The Court in Williams determined that the Fourth Amendment did not require reasonable suspicion before a vessel could be stopped at sea. 617 F.2d at 1081-82; see also United States v. Warren, 578 F.2d 1058, 1064 (5th Cir. 1978) (en banc). Thus, unlike the automobile search in Prouse, the Coast Guard need not have reasonable suspicion of an ongoing violation in order to implement a valid seizure of a stateless vessel. See United States v. Williams, supra, 617 F.2d at 1081-82; see also United States v. Espinosa-Cerpa, 630 F.2d 328, 334 (5th Cir. 1980); United States v. Hayes, 653 F.2d 8, 11 (1st Cir. 1981); United States v. Hilton, 619 F.2d 127, 132 (1st Cir. 1980), cert. denied, 449 U.S. 887, 101 S.Ct. 243, 66 L.Ed.2d 113 (1981).
 
 
 26
 Additionally, even had the "reasonable suspicion" standard in Prouse been applicable, the seizure in the instant case would not have transgressed the Fourth Amendment. Under international law, the Coast Guard has the authority to approach an unidentified vessel in order to ascertain the vessel's nationality. The Marianna Flora, supra, 24 U.S. at 43; United States v. Cortes, supra, 588 F.2d at 110; see also H. Meyers, supra, at 82 n.1; H. Smith, The Law and Custom of the Sea 64-65 (1959). Consistent with the Fourth Amendment, the Coast Guard may subject the unidentified vessel to a seizure for the limited purposes of a document inspection where there is reasonable suspicion to believe either that the vessel is an American flagship or that the vessel is attempting to conceal its identity. United States v. Williams, supra, 617 F.2d at 1082; United States v. Cortes, supra, 588 F.2d at 110; United States v. Rubies, 612 F.2d 397, 404 (9th Cir. 1979), cert. denied, 446 U.S. 940, 100 S.Ct. 2162, 64 L.Ed.2d 794 (1980); see also Convention on the High Seas, supra, Art. 22.
 
 
 27
 When the Coast Guard cutter DEPENDABLE encountered the FOUR ROSES, the FOUR ROSES was not flying any flag.[23] Moreover, crewmen on board informed Coast Guard officials that the nationality of the vessel was "Miami, Florida". The FOUR ROSES also had "Miami, Florida" stenciled across its bow. Thus the Coast Guard officials had reasonable cause to believe that the FOUR ROSES was an American flagship. They therefore had the requisite reasonable suspicion necessary to board the FOUR ROSES and check the vessel's documentation. After boarding the FOUR ROSES, Coast Guard officials saw numerous bales of marijuana. The officials, therefore, then had probable cause to believe that the vessel was engaged in the distribution of controlled substances and they were free to effectuate a more intrusive seizure and search of the vessel.[24]
 
 V.
 
 28
 Lastly, defendants contest the sufficiency of the evidence supporting the convictions. In adjudicating the issue, we must examine the evidence in the light most favorable to the Government, see Glasser v. United States, 315 U.S. 60, 80, 62 S.Ct. 457, 469, 86 L.Ed. 680 (1942), and determine whether a jury must have entertained a reasonable doubt about the defendants' guilt. United States v. Bell, 678 F.2d 547 (5th Cir. 1982) (en banc); United States v. Glen-Archila, 677 F.2d 809 (11th Cir. 1982).
 
 
 29
 The FOUR ROSES contained almost 57,000 pounds of marijuana packed in over 1,000 large bales. The bales were plainly evident throughout the seventy foot long vessel. Bales were located in the passageways, in the galley area, between bunks in the sleeping quarters all through the cabin area, and in the pilothouse. A Coast Guard officer testified that after he boarded the FOUR ROSES the smell of marijuana was noticeable. Furthermore, the FOUR ROSES had sophisticated radio equipment not normally found on a shrimping vessel. Moreover, the vessel lacked some of the equipment ordinarily used to locate shrimp. The vessel also contained four stencils that presumably could be or were actually used to alter the name of the ship's homeport on the vessel. Finally, the FOUR ROSES changed course when the DEPENDABLE was only four miles away. The course change could have reasonably been interpreted as an evasive tactic to avoid contact with the cutter. We conclude that the aforementioned evidence more than suffices to establish beyond any doubt that the crewmen on board the FOUR ROSES knowingly and intentionally conspired to and did violate Section 955a. See United States v. Liles, supra, 670 F.2d at 992; United States v. Lopez, 663 F.2d 532, 534 (5th Cir. 1981).
 
 
 30
 For the reasons stated herein, the convictions of defendants in United States v. Marino-Garcia, No. 81-5551, are AFFIRMED. The district court's decision in United States v. Cassalins-Guzman, No. 82-5284, is REVERSED, the indictments are ordered reinstated, and the case is REMANDED to the district court for further proceedings.
 
 
 
 [1]
 Federal courts have upheld this country's right to subject stateless vessels on the high seas to its jurisdiction in a number of instances. See, e.g., United States v. Arra, 630 F.2d 836 (1st Cir. 1980); United States v. Monroy, 614 F.2d 61 (5th Cir.), cert. denied, 449 U.S. 892, 101 S.Ct. 250, 66 L.Ed.2d 117 (1980); United States v. Dominguez, 604 F.2d 304 (4th Cir. 1979); United States v. May-May, 470 F.Supp. 384 (S.D.Tex.1979). In every such instance, however, evidence indicated that the stateless vessel had been involved in illegal activity intending to have an effect inside the United States. Until today, no case has dealt with the right to extend jurisdiction over stateless vessels on the high seas absent proof of a nexus between the vessel and the United States
 
 
 [2]
 The Coast Guard cutter DEPENDABLE is establishing a firm reputation as the scourge of drug traffickers plying the Caribbean. See United States v. Gray, 659 F.2d 1296 (5th Cir. 1981) (DEPENDABLE seized vessel containing bales of marijuana); United States v. Mazyak, 650 F.2d 788 (5th Cir. 1981) (DEPENDABLE seized vessel containing 14,611 pounds of marijuana); United States v. Espinosa-Cerpa, 630 F.2d 328 (5th Cir. 1980) (DEPENDABLE seized vessel containing 35,371 pounds of marijuana); United States v. Robbins, 623 F.2d 418 (5th Cir. 1980) (DEPENDABLE seized vessel containing 690 pounds of marijuana)
 
 
 [3]
 We note that the evidence was more than sufficient to support the determination that the FOUR ROSES was a stateless vessel. A vessel will be deemed stateless where it sails under the authority of two or more States and uses them according to convenience. See note 10, infra. The FOUR ROSES appears to have been registered in Honduras under the name JENNY CONNER. When approached by the Coast Guard cutter DEPENDABLE, however, the vessel displayed no indicia of Honduran authority. In fact, the name of the vessel had been altered and the words "Miami, Florida" stenciled on the bow to indicate the home port. Additionally, crewmen told Coast Guard personnel that the vessel's nationality was "Miami, Florida." Thus the vessel was registered under one nationality but was asserting a false nationality when encountered by the Coast Guard cutter DEPENDABLE. Under Section 955a, the vessel was clearly characterizable as stateless. Moreover, expert testimony indicated that under international law the FOUR ROSES would also be considered stateless
 
 
 [4]
 The district court in Marino-Garcia found that jurisdiction over stateless vessels exists under the "protective principle." The protective principle requires proof that the illegal activity threatens the security or governmental functions of the United States. See note 14, infra. The district court reasoned that drug trafficking amounts to a threat to this country's security. Accord, United States v. Angola, 514 F.Supp. 933 (S.D.Fla.1981)
 Our disposition of this case renders consideration of the protective principle unnecessary. Nonetheless, we note that if drug trafficking is found to be a threat to the security of the United States this country would have jurisdiction under the protective principle over all vessels engaged in the illicit practice, including those flying foreign flags.
 
 
 [5]
 Seven of the defendants received five year sentences and a five year special parole term. The remaining two defendants were sentenced to seven years' incarceration and received a six year special parole term
 
 
 [6]
 For the purposes of this appeal, the parties have stipulated that the LADY MARK is a stateless vessel
 
 
 [7]
 The district court judge made an identical ruling in United States v. James-Robinson, 515 F.Supp. 1340 (S.D.Fla.1981). The appeal in that case was dismissed as moot after the Immigration and Naturalization Service deported the crewmen of the seized vessel
 
 
 [8]
 The high seas include all waters beyond the territorial seas of the United States and beyond the territorial seas of any foreign nation. 21 U.S.C.A. § 955b(d); United States v. Louisiana, 394 U.S. 11, 22, 89 S.Ct. 773, 780, 22 L.Ed.2d 44 (1969); United States v. Postal, 589 F.2d 862, 868 (5th Cir. 1979). The territorial seas of the United States extend three miles from the coast. United States v. McRary, 665 F.2d 674, 677 n. 4 (5th Cir. 1982). The United States has also adopted a contiguous zone that extends nine miles beyond the territorial seas. Id. Finally, the United States has created an exclusive economic zone over portions of the continental shelf that are appertained to this country, 43 U.S.C.A. § 1331 et seq., and a 200 mile fishery zone, 16 U.S.C.A. § 1811
 
 
 [9]
 21 U.S.C.A. § 955a states in pertinent part:
 (a) It is unlawful for any person on board a vessel of the United States, or on board a vessel subject to the jurisdiction of the United States on the high seas, to knowingly or intentionally manufacture or distribute, or to possess with intent to manufacture or distribute, a controlled substance.
 
 
 [10]
 21 U.S.C.A. § 955b states in pertinent part:
 (d) "Vessel subject to the jurisdiction of the United States" includes a vessel without nationality or a vessel assimilated to a vessel without nationality, in accordance with paragraph (2) of article 6 of the Convention on the High Seas, 1958.
 Article 6 of the Convention on the High Seas, supra, states in relevant part:
 
 
 [2]
 A ship which sails under the flags of two or more States, using them according to convenience, may not claim any of the nationalities in question with respect to any other State, and may be assimilated to a ship without nationality
 
 
 [11]
 All nations may, however, assert jurisdiction over foreign vessels located within their territorial waters. United States v. Diekelman, 92 U.S. 520, 525, 23 L.Ed. 742 (1875) (according to the law of nations, "merchant vessels of one country visiting the ports of another ... subject themselves to the law which governs the port they visit, so long as they remain"); see also The Schooner Exchange v. M'Faddon, 11 U.S. (7 Cranch) 116, 136, 3 L.Ed. 287 (1812); Church v. Hubbart, 6 U.S. (2 Cranch) 187, 2 L.Ed. 249 (1804); Restatement (Second) of Foreign Relations § 17 (1965)
 
 
 [12]
 Under the nationality or law of the flag principle, any nation may extend jurisdiction to all vessels flying its flag. G. Mangone, supra, at 164 ("A state can assert jurisdiction over all vessels flying its flag on the high seas."); see also United States v. Flores, 289 U.S. 137, 53 S.Ct. 580, 77 L.Ed. 1086 (1933); Wilson v. McNamee, 102 U.S. 572, 574, 26 L.Ed. 234 (1880); United States v. Baker, 609 F.2d 134, 138 (5th Cir. 1980); Restatement (Second) of Foreign Relations §§ 26-28. This Court has previously held that Section 955a applies to all American vessels, including those located on the high seas. United States v. Julio Diaz, 678 F.2d 1031 (11th Cir. 1982); United States v. Riker, 670 F.2d 987, 988 (11th Cir. 1982); United States v. Liles, 670 F.2d 989, 990 n. 2 (11th Cir.), cert. denied, --- U.S. ----, 102 S.Ct. 2300, 72 L.Ed.2d ---- (1982)
 
 
 [13]
 Section 18 of the Restatement (Second) of Foreign Relations provides:
 A state has jurisdiction to prescribe a rule of law attaching legal consequences to conduct that occurs outside its territory and causes an effect within its territory, if either
 (a) the conduct and its effect are generally recognized as constituent elements of a crime or tort under the law of states that have reasonably developed legal systems, or
 (b)(i) the conduct and its effect are constituent elements of activity to which the rule applies; (ii) the effect within the territory is substantial; (iii) it occurs as a direct and foreseeable result of the conduct outside the territory; and (iv) the rule is not inconsistent with principles of justice generally recognized by states that have reasonably developed legal systems.
 The Supreme Court acknowledged in Strassheim v. Daily, 221 U.S. 280, 285, 31 S.Ct. 558, 560, 55 L.Ed. 735 (1911) (Holmes, J.), that jurisdiction could be predicated upon illegal activities outside the United States that have an effect in this country. More recent cases have found that the United States may assert jurisdiction over activities occurring outside the country but intended to produce an effect inside it. See, e.g., United States v. Baker, supra, 609 F.2d at 138; Rivard v. United States, 375 F.2d 882 (5th Cir.), cert. denied, 389 U.S. 884, 88 S.Ct. 151, 19 L.Ed.2d 181 (1967). In conspiracies on the high seas, the evidence need only show that the defendants intended to consummate the conspiracy within the United States. United States v. Gray, supra, 659 F.2d at 1298; United States v. DeWeese, 632 F.2d 1267, 1271 (5th Cir. 1980), cert. denied, --- U.S. ----, 102 S.Ct. 358, 70 L.Ed.2d 188 (1981); United States v. Ricardo, 619 F.2d 1124, 1129 (5th Cir.), cert. denied, 449 U.S. 1063, 101 S.Ct. 789, 66 L.Ed.2d 607 (1981).
 
 
 [14]
 Section 33 of the Restatement (Second) of Foreign Relations provides in pertinent part:
 (1) A state has jurisdiction to prescribe a rule of law attaching legal consequences to conduct outside its territory that threatens its security as a state or the operation of its governmental functions, provided the conduct is generally recognized as a crime under the law of states that have reasonably developed legal systems.
 Unlike the objective principle, the protective principle does not require that there be proof of an actual or intended effect inside the United States. Id., Comment C; United States v. Pizzarusso, 388 F.2d 8, 10-11 (2d Cir. 1967), cert. denied, 392 U.S. 936, 88 S.Ct. 2306, 20 L.Ed.2d 1395 (1968). The few federal cases that have relied upon the protective principle generally involve forgeries of government documents in foreign countries or attempts to illegally obtain entry into the United States. See, e.g., United States v. Khalje, 658 F.2d 90 (2d Cir. 1981) (false statements on United States visa application); United States v. Birch, 470 F.2d 808 (4th Cir. 1972), cert. denied, 411 U.S. 931, 93 S.Ct. 1897, 36 L.Ed.2d 390 (1973) (forgery of military papers in order to illegally enter United States); United States v. Pizzarusso, supra, 388 F.2d 8 (making false statements on United States visa application); Rocha v. United States, 288 F.2d 545 (9th Cir.), cert. denied, 366 U.S. 948, 81 S.Ct. 1902, 6 L.Ed.2d 1241 (1961) (attempt to illegally enter United States); see also United States v. Columba-Colella, 604 F.2d 356 (5th Cir. 1979) (protective principle not applicable to receipt of stolen property in Mexico). Two cases have suggested that the unlawful importation of controlled substances directly threatens this country's security and therefore gives rise to jurisdiction under the protective principle. United States v. Newball, 524 F.Supp. 715, 718 (E.D.N.Y.1981); United States v. Egan, 501 F.Supp. 1252, 1258 (S.D.N.Y.1980).
 
 
 [15]
 The passive principle permits a country to assert jurisdiction over anyone that perpetrates a crime on that country's citizens. See, e.g., United States v. Layton, 509 F.Supp. 212, 216 n. 5 (N.D.Cal.1981), appeal dismissed, 645 F.2d 681 (9th Cir.), cert. denied, 452 U.S. 972, 101 S.Ct. 3128, 69 L.Ed.2d 984 (1981). Numerous cases have noted in passim the existence of the passive principle of jurisdiction. United States v. King, 552 F.2d 833, 851 (9th Cir. 1976), cert. denied, 430 U.S. 966, 97 S.Ct. 1646, 52 L.Ed.2d 357 (1977); United States v. Pizzarusso, supra, 388 F.2d at 10 n. 5; Rivard v. United States, supra, 375 F.2d at 885; Rocha v. United States, supra, 288 F.2d at 594 n. 4. The principle, however, has generally not been accepted in this country as a basis for jurisdiction. Zenith Radio Corp. v. Matsushita Electric Industrial Co., 494 F.Supp. 1161, 1179 n. 38 (E.D.Pa.1980); Restatement (Second) of Foreign Relations § 30(2); see also United States v. Columba-Colella, supra, 604 F.2d at 360 (apparent sub silento rejection of passive principle)
 
 
 [16]
 Convention on the High Seas, supra, Art. 19 & 22(b); Restatement (Second) of Foreign Relations § 34. The Constitution specifically authorizes Congress to "define and punish Piracies and Felonies committed on the high Seas, and Offences against the Law of Nations." U.S.Const. art. I, § 8. The United States has long banned both piracy and the slave trade. See The Emily and The Caroline, 22 U.S. (9 Wheat) 381, 385, 6 L.Ed. 116 (1824); The Marianna Flora, 24 U.S. (11 Wheat) 1, 40, 6 L.Ed. 405 (1826). In a pair of early cases, the Supreme Court held that stateless vessels engaged in piracy and certain other crimes could be subjected to the jurisdiction of the United States. United States v. Holmes, 18 U.S. (5 Wheat) 412, 416-17, 5 L.Ed. 122 (1820); United States v. Klintock, 18 U.S. (5 Wheat) 144, 152, 5 L.Ed. 55 (1820)
 There is a growing consensus among nations to include drug trafficking as a universally prohibited crime. See Single Convention on Narcotic Drugs, 18 U.S.T. § 1407 (1962). Although ratified by the United States, the multilateral treaty has not received the approval of the requisite number of countries necessary for its entry into force.
 It may well be that the time has arrived when the Congress of the United States should by appropriate legislation include drug trafficking in the same category as slave trafficking and piracy and authorize prosecution of drug trafficking on the high seas as offenses against the Law of Nations within the meaning of Art. I, § 8, Clause 10 of the United States Constitution. This would extend the criminal jurisdiction of the United States to all foreign vessels on the high seas that are engaged in drug trafficking.
 
 
 [17]
 The remaining arguments were raised only by the defendants in United States v. Marino-Garcia
 
 
 [18]
 See note 10, supra
 
 
 [19]
 Defendants also complain that it is fundamentally unfair to presume that crewmen on board a non-American flag vessel en route to a foreign country had notice of Section 955a. We find the contention specious. Although defendants may not have had specific knowledge of Section 955a, they can be charged with a general understanding of international law, particularly as it relates to stateless vessels on the high seas. United States v. Angola, 514 F.Supp. 933, 935 (S.D.Fla.1981). As previously noted, the law of nations permits all nations to assert jurisdiction over stateless vessels. Thus defendants should have been aware that the FOUR ROSES was amenable to the jurisdiction of the United States. Further, there has been a growing trend among nations to make trafficking in controlled substances a universal crime. See Single Convention on Narcotic Drugs, 18 U.S.T. § 1407. More specifically, the United States has long been seizing stateless vessels trafficking in controlled substances on the high seas. See Note 1, supra. The defendants should therefore have been on notice that the United States or any other nation concerned with drug trafficking has commenced subjecting stateless vessels to its jurisdiction. Accordingly, we conclude that Section 955a does not result in "unfair surprise" in violation of the due process clause
 
 
 [20]
 We note that the seizure does not seem to have been entirely random. Evidence in the record indicated that the Coast Guard has a policy of stopping every American vessel under 200 feet in length encountered by cutters. The FOUR ROSES was only 70 feet in length. Moreover, the Coast Guard had reasonable cause to believe the vessel was an American flagship. As a result, the seizure of the FOUR ROSES was markedly different from the "standardless and unconstrained" seizure prohibited by the Supreme Court in Delaware v. Prouse, 440 U.S. 648, 99 S.Ct. 1391, 59 L.Ed.2d 660 (1979)
 
 
 [21]
 The Fourth Amendment extends to both foreign and American vessels. United States v. Williams, 617 F.2d 1063 (5th Cir. 1980) (en banc). The opinion did not discuss the extension of the Fourth Amendment to stateless vessels and we consider the issue an open one
 Without deciding the issue, we note that a number of considerations militate against the extension of the Amendment to stateless vessels. Stateless vessels have no right to travel freely on the high seas and are considered a threat to the order and stability of the oceans. Since the vessels have no rights under international law, we find it somewhat dubious to suggest that the Founding Fathers intended to provide these vessels with the prophylactic safeguards contained in the Fourth Amendment.
 Finally, we note that even if the Fourth Amendment applies, a vessel's status as stateless may well render any search and seizure "reasonable."
 
 
 [22]
 The Eleventh Circuit has adopted the case law of the former Fifth Circuit as its governing body of precedent. This precedent is binding unless and until overruled or modified by this Court en banc. Bonner v. City of Prichard, 661 F.2d 1206, 1209-11 (11th Cir. 1981) (en banc). We are therefore bound by the former Fifth Circuit decisions regarding this issue and could not adopt the approach suggested by the Ninth Circuit in Piner even were we to find it persuasive
 
 
 [23]
 Testimony from an expert witness indicated that all vessels customarily flew their flag at night
 We note that the absence of any obvious indicia of nationality may well be sufficient of itself to provide the Coast Guard with the requisite reasonable suspicion to seize and board a vessel to determine its nationality.
 
 
 [24]
 Defendants raise one final constitutional question. They claim that Section 955a violates the Constitution by creating a strict liability offense for the possession of controlled substances with an intent to distribute. We consider the contention devoid of merit
 The statute makes it a crime to "knowingly or intentionally manufacture or distribute, or to possess with intent to manufacture or distribute a controlled substance." 21 U.S.C.A. § 955a(a). Defendants apparently assert that the phrase "knowingly or intentionally" only modifies "manufacture or distribute." Thus the statute makes anyone possessing large quantities of a controlled substance strictly liable.
 We summarily dispose of the argument by noting that Congress clearly intended to require that all illegal acts prohibited by Section 955a be knowing or intentional. S.Rep.No.855, 96th Cong., 2d Sess. 3 (1980) ("Finally, the Committee adopted amendments to Section (955a) (a), (b) and (c) to require that the described illegal acts be performed 'knowingly and intentionally'. These amendments are intended to establish consistency with the Comprehensive Act...").